### John Reardon v. The State.

1. Robbery. — Indictments for robbery which substantially follow common-law precedents are sufficient.

2. Charge of the Court. — The charge should not only be correct in the abstract, but be so explicitly adapted to the pleadings and proof that the jury cannot misunderstand its application to the evidence.

3. Same. — In a trial for robbery, the court below having given in charge to the jury the statutory definition of the offense, the presumption of innocence, and the reasonable doubt, and apprised them of their exclusive right to weigh the evidence, instructed them to convict if they found that the accused " did commit the robbery as. charged in the indictment, or participated in the same;" which is here impugned as too vague. But, *held*, that as the defense was *alibi*, and as the only conflict of evidence arose thereon, the instruction, though brief, was not only correct, but adequate.

4. Evidence. — In a trial for robbery, the prosecution was allowed, over objection, to prove that the accused, the night after the robbery, was armed with a Colt's repeater, the lever of which was bent, as if by a blow. *Held*, that, in connection with certain other evidence, this proof was relevant to the identification of the accused and to his defense of *alibi*.

5. PRACTICE. — The court below may allow evidence to be introduced at any time before the argument to the jury is concluded.

6. PRACTICE IN THIS COURT. — Note conflicting evidence, illustrative of the rule of this court not to disturb convictions on such evidence.

APPEAL from the District Court of Dallas. Tried below before the Hon. Z. HUNT.

E. H. Gruber, the first witness for the State, testified that he was president of the State Savings Bank of Dallas. On August 18, 1876, he was sitting in the bank, when two men entered it. The first he noticed of them was seeing one of them sitting on the counter, with his feet on the inside, as if in the act of getting over on the inside. The man was disguised, and had an unnatural look about him. Witness started toward him, when he struck witness over the head with a pistol, stunning him, and then fired at, but missed him. The two men went out by the back door. They took from the bank something over $200 in fractional currency on that occasion. Witness could not identify the prisoner on trial as one of the men he had been speaking of. "The man looked larger than the defendant does now. He had on greasy-looking, rough clothing." Witness recognized a piece of buffalo-hide which, as he had been told, was found in the back yard of the bank. He knew the amount of money taken only by balancing the books and finding that amount short, and by finding fractional currency scattered over the floor. The bank fronts on Main Street. Witness was not seriously hurt by the blows he received, though knocked to his knees, and his head cut in several places.

William Godfrey, for the State, testified that on the occasion in question, he, while in a water-closet in rear of the bank, heard a pistol-shot and a scream, and, coming out, saw the defendant get over a fence between the bank premises and an adjoining vacant lot. The defendant had a pis-

tol in his hand, and passed near witness, who recognized him. When he reached the corner of the engine-house, about thirty feet from witness, he turned the corner, going east on Commerce Street, and witness saw no more of him. Defendant on that occasion was shaved as at the trial, wearing a mustache and imperial, without chin whiskers, and had on light clothes and a light hat. Witness was positive that the defendant went east around the corner of the engine-house, and up Commerce Street, which runs east and west. Lamar Street runs north and south, to the west of the bank. Immediately after the defendant crossed the fence, another man came over the same fence, untied a horse near witness, mounted, and passed out through the vacant lot to Commerce Street, went west to Lamar Street, and along that street towards the south. Witness did not know this man, but knew he was not the defendant. When he turned the corner into Lamar Street, he fired off his pistol. He was dressed in dark clothes, had dark whiskers, and wore a dark hat. Witness had never known or seen the defendant, Reardon, prior to the occasion spoken of. The Methodist church is situated on the north-east corner of Commerce and Lamar Streets, and fronts on the latter; the engine-house is immediately east and back of the church, and fronts on Commerce Street; the compress is situated on Lamar Street, south of the church, on the second block. The defendant did not go towards Lamar Street; the other man did. Defendant was on foot; the other man rode a horse, which, defendant thought, was a sorrel.

J. W. Record, for the State, testified that, on the day of the robbery, he was unloading wheat at the compress, on Lamar Street, south of Commerce, when a man rode down Lamar Street and fired a pistol in the air. Witness recognizes the defendant as that man. He was dressed in light clothes, and was riding a sorrel horse. A good many people were following him down Lamar Street. The pistol-

shot frightened witness' team of horses, and witness was holding them as the defendant passed him and went on south, across the railroad track, when witness lost sight of him.

J. C. McNealus, for the State, testified that, on the day in question, he was looking out of an up-stairs window in the building on the north-west corner of Commerce and Lamar Streets, and saw two men come out of the vacant lot between the Methodist church and the engine-house, on Commerce Street. The one who came out first got on a horse in front of the engine-house ; the other came out on a horse. They both went west to Lamar Street, and turned south down that street. Witness saw their faces, but could not say that defendant was one of them. Just as they came out of the vacant lot, witness heard the noise and confusion occasioned by the robbery.

Sweeden, a witness for the State, was with Paul Jamison, on the day of the robbery, at his brick-yard, about a mile south of the savings bank, when three men passed them, at a distance of not less than thirty nor more than fifty yards. One of them had a pistol in his hand, and witness then recognized one of them as the defendant, whom he had known for several years. Jamison asked witness who they were, and witness told him one of them was John Reardon. They were running their horses, and went south.

Paul Jamison, for the State, said he saw the three men on the occasion spoken of by Sweeden. They rode in a faster gait than a lope, and went south. The hat of one of them fell off. Witness asked Sweeden who they were, and he said one of them was Jack Reardon. They were some 300 feet distant, and witness could not recognize the defendant as one of them. Witness saw as much of them as Sweeden did. This was between one and two o'clock on the day of the robbery.

W. L. Gross, for the State, testified that, two days be-

fore the robbery, he brought to Dallas some hides, and among them a buffalo-hide, which was on top of the others in the wagon. Witness had sold the hides to one Catz, and had his wagon in front of Catz's door when a man, who, witness thought, was the defendant, came up and asked the price of hides. He seemed to examine the hides on the wagon, and then went into the house, where some buffalo-hides were piled up. Witness was sitting in the door, and saw the man kick over one of the hides on the floor, and noticed him fooling with a tag on a buffalo-hide. A " tag " is a piece of hide which, in skinning buffaloes, usually hangs down near the shoulder or the flank. The day after the robbery, the same piece of buffalo-hide, or tag, now exhibited in court was shown to witness by Mr. Anderson, and they went and compared it with the hide which the stranger was handling. The tag on the hide had been cut off, and this piece in court fitted the place cut on the hide. Witness did not *know* that the defendant was the man he saw that day.

W. H. Anderson, for the State, said that, a few seconds after the robbery, he found in the back yard of the bank a piece of buffalo-hide, with a wire and string so attached as to make it appear as if used for false whiskers. Witness compared this piece with a hide cut at Catz's hide-house, and found they fitted each other. The night of the day on which the robbery was committed, witness and two other men arrested the defendant at a place called Point Breeze, about a mile east of the court-house. He then had on the white-handled pistol now exhibited to witness.

J. W. Spencer, for the State, also identified the pistol in court as the one taken from the defendant, when arrested, and described it as " a white-handle Colt's large pattern. The rod under the bottom of the barrel, used for ramming the bullets in the cylinder, is bent so that it touches the barrel. *  *  * The handle next to the breech is bulged

out at both sides.'' Witness said that it took a very hard blow to put the pistol in such a condition — a blow which, if struck on a man's head, would kill, or nearly kill. The witness believed that the defendant lived or stayed near the place at which he was arrested.

This was all the evidence for the State.

The defense first introduced Sydney Johnson, who testified that he, with many others, saw and pursued the man on the sorrel horse spoken of by the States' witness Record ; and that the man was a large man, dressed in black, and was not the defendant. Returning immediately from the fruitless pursuit, witness went to the State Savings Bank, and, finding it closed, then went east on Main street about fifty yards, to a barber shop kept by Matt Cox. Two or three minutes after witness reached the shop, the defendant came walking down Main Street from the direction of said bank, and stopped a minute or two, talking with Monroe Spikes. He was then dressed the same as now, in light-colored pants, coat, and vest, with a light-brown or snuff-colored soft felt hat. '' I noticed his dress particularly, because he had on a fine pair of Scotch-bottom boots.'' Witness did not then know the defendant, but made inquiry of Spikes, who told him that the man was John Reardon, and the defendant in court is the same man.

Matt Cox, for the defense, stated that within three or four minutes after the robbery he met the defendant, whom he knew well, between the savings bank and witness' barber shop, which were about fifty yards apart. The defendant was coming towards the bank, west, and asked witness what was the matter. Witness told him it was a bank robbery, and he then passed on up east, towards the bank.

Monroe Spikes, for the defense, stated that about twenty minutes after the robbery the defendant came to Cox's barber shop, where witness worked. Witness was on the

sidewalk with Sydney Johnson, and the defendant stopped and talked with witness for two or three minutes, and then went east on Main Street. Sydney Johnson asked witness who defendant was, and witness told him he was John Reardon. Witness had known defendant for some seven years.

D. H. Weaver, for the defense, described the man who rode down Lamar Street, shooting off his pistol, as a large man, dressed in black or dark clothes, and a black slouch hat, and with large black whiskers. Witness did not know him.

George Hawkins, for the defense, stated that he was with the crowd in pursuit of the two men. The one on horseback, who passed the State's witness Record on Lamar Street, and fired off his pistol, was a large man, and had on dark clothes and a black hat. The other man was on foot. He went down Lamar to the next street, and took it, going east. Witness at first thought this man was the defendant, but now does not so believe. Witness had frequently seen the defendant before the time spoken of.

James Kearney, for the defense, said he was a waiter and drummer for the Lafayette Restaurant, on Elm Street, just west of Lamar. On the day of the robbery, seeing the crowd at the corner of Lamar and Main Streets, he started over there, and met the defendant between Main and Elm Streets. Witness asked the defendant what was the matter, and learned from him that a bank had just been robbed. Witness went back to the restaurant, and found the defendant sitting at a table. He told witness to bring him a cup of coffee, but invited him to take a glass of beer first. They got the beer, and then witness brought the coffee for the defendant, and went out. The defendant boarded at that restaurant, and used to give witness a glass of beer every day.

Tom Brennan, for the defense, stated that, within five minutes of three o'clock on the day of the robbery, he met

the defendant on Main Street, next door but one to the State Savings Bank. They passed down Main Street together, to the next corner, and took a drink together. Defendant was then dressed just as now.

—— Hedrick, for the defense, testified that he saw the defendant several times the day of the robbery. Witness, defendant, and a man named Frenchey went into the saloon on Main Street, half a block east of the State Savings Bank, to get a drink. Witness went to the rear of the saloon, and while out there, heard the noise and excitement, and went back into the bar-room. When he got into the room, Frenchey and the defendant had gone out, and the barkeeper was standing at the door, looking up the street, and he asked witness to stay there while he went up that way. Witness saw the defendant again that evening, down by the Lamar Hotel.

T. Brennan, for the defense, stated that about four o'clock in the afternoon of the day of the robbery, he saw the defendant near the market-house, going toward East Dallas, where he lived, or had his room. The Point Breeze House is in East Dallas.

Several of the witnesses fixed half-past one o'clock as the hour at which the robbery occurred. All other matters of significance appear in the opinion. The verdict allotted to the defendant seven years of the penitentiary.

*E. G. Bower*, for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

ECTOR, P. J. The defendant was indicted in this case for robbery, under article 2379, Paschal's Digest. He was found guilty, and his punishment was assessed at confinement in the penitentiary for seven years. The defendant

made a motion for new trial, which was overruled, and the case is now before this court on appeal.

The first question that presents itself for our consideration is the action of the court in overruling defendant's motion to quash the indictment, because . " there is no offense against the laws charged therein." It is submitted on the part of the defense that, the indictment being for robbery, the pleader should, under our statute (Pasc. Dig., art 2379), have alleged the connection between the assault committed, or violence used, and the fraudulent taking of the property ; and that this can only be done by using the preposition " by," or some word of similar import. The indictment follows substantially the common-law precedents, and is sufficient. 1 Whart. Prec. 410 ; Stark. Cr. Pr. 442 ; 2 Archb. Cr. Pr. & Pl. 521 ; Pasc. Dig., arts. 2863, 2865.

The second question presented is as to the charge of the court. The defendant's counsel, both in his brief and oral argument, contends that the charge of the court is too vague and general in its terms, and is not an exposition of the law of the case as made by the proof. Paschal's Digest, article 3059, of the statute, reads as follows, to wit : " After the argument of any criminal cause has been concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law as applicable to the case ; but he shall not express any opinion as to the weight of evidence, nor shall he sum up the testimony. This charge shall be given in all cases of felony, whether asked or not."

The following is a copy of the charge of the court : " The defendant is on trial for a robbery alleged to have been committed on the 18th day of August, 1876.

" 1. Robbery is thus defined : If any person, by assault or by violence, and putting in fear of life or bodily injury, shall fraudulently take from the person or possession of another any property, with intent to appropriate the same to his own use, he shall be punished by confinement

in the penitentiary for a term of not less than two nor more than ten years.

" 2. If you believe from the evidence that the defendant, in the county of Dallas, within five years before the finding of the indictment against him, did commit the robbery as charged in the indictment, or that he participated in the same, you will find him guilty and assess his punishment as aforesaid.

" 3. The defendant is presumed to be innocent till proven guilty by competent evidence.

" 4. If from the evidence you have a reasonable doubt of the guilt of defendant, you will give him the benefit of the doubt, and acquit.

" 5. You are the exclusive judges of the evidence and the credibility of the witnesses, and will give to the testimony of each such weight as you think it entitled to."

A charge ought not only to be correct as an abstract enunciation of the law, but be so explicitly adapted to the pleadings and the proof as not to be misunderstood by the jury in their application of the law to the facts in evidence. The charge in this instance was a short one. It was a correct enunciation of the law as applicable to the facts in the case, and, in our judgment, could not have misled the jury. Counsel for defendant, in his argument, calls attention to the second subdivision of the charge, and says it is defective in this, that the words " participated in the same " are not sufficiently qualified or explained by the court.

The evidence shows that a robbery was committed, and that several persons took part in it, and that the guilty parties immediately afterwards were seen running from the bank where it was committed. There was a conflict in the evidence as to whether or not the accused was one of the guilty parties. Take the charge as a whole, and the words " participated in " admit of no doubtful construction, and could not have misled the jury. " Participate " is derived

from two Latin words, "*pars*," part, and "*capio*," to take. It means to take part—to share in common with others. This portion of the charge was especially proper in view of the defense which was mainly relied on, to wit, an *alibi*. No bill of exception was taken to the charge of the court. The court did not err in refusing the special instructions asked by the defendant.

On the trial of the cause in the District Court, the county attorney asked a witness the following question : " Was the defendant armed the night he was arrested, being the night after the robbery?" To this the defendant objected ; which objection being by the court overruled, defendant excepted, and took his bill of exceptions. The bill of exceptions does not show on what grounds defendant excepted to the testimony. A reference to the statement of facts will show that defendant's objection was not well taken. It shows that one of the robbers, when first seen in the bank, struck E. H. Gruber, the president of the bank, a severe blow over the head with a pistol, and then shot at him. The condition of this pistol found on the person of the accused presented the appearance of having been used in striking a severe blow ; the rod under the bottom of the barrel, used for ramming the bullets in the cylinder, was bent so that it touched the barrel. It was proper evidence to go to the jury, as a circumstance tending to identify the defendant as one of the robbers.

On the trial in the court below, after both parties had announced that they had closed their evidence, the county attorney offered in evidence the charter and by-laws of the State Savings Bank, to which the defendant objected ; which objections were by the court overruled, and the evidence was admitted. To this ruling of the court the defendant took a bill of exceptions. The bill of exceptions does not show that the evidence was admitted after the argument to the jury had concluded, and was, therefore, not well taken.

Article 3046, Paschal's Digest, provides as follows: "The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appear that it is necessary to a due administration of justice." *Jones v. The State*, 3 Texas Ct. App. 153.

We believe there is enough in the record to show that a robbery was committed, and the amount of money taken by the robbers; that the money taken was the property of the State Savings Bank, and was taken from the possession of E. H. Gruber, the president of the bank, forcibly and without his consent; and that every material allegation in the indictment was proven.

There is a conflict in the testimony. The jury had all the evidence before them. They saw the witnesses on the stand, heard their statements, and observed their manner of testifying. The district judge who presided at the trial overruled defendant's motion for a new trial. The district judge and the jury were in a better position to decide properly the weight and degree of credit to be attached to the testimony of the different witnesses than we can be by an inspection of the record.

This disposes of all the points presented in the record upon which the defendant relies for a reversal of the judgment.

Believing that defendant has had a fair and impartial trial, and been legally convicted, the judgment of the lower court is affirmed.

*Affirmed.*